UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------- X
                                         :
CAPSTONE ASSET MANAGEMENT CO., LTD.,     :
                                         :
                         Plaintiff,      :        21cv997 (DLC)
                                         :
             -v-                         :        OPINION AND ORDER
                                         :
DEARBORN CAPITAL GROUP LLC and OREN      :
RICHLAND,                                :
                                         :
                         Defendants.     :
                                         :
---------------------------------------- X

APPEARANCES

For plaintiff Capstone Asset Management Co., Ltd.:
Lee H. Rubin
Mayer Brown LLP
Two Palo Alto Square, Suite 300
3000 El Camino Real
Palo Alto, CA 94306

Michelle J. Annunziata
Mayer Brown LLP (NY)
1221 Avenue of the Americas, 14th Floor
New York, NY 10020-1001

For defendants Dearborn Capital Group LLC and Oren Richland:
Latisha Vernon Thompson
Morrison Cohen, LLP (NY)
909 Third Avenue
New York, NY 10022

Gayle Elise Pollack
Morrison Cohen, LLP (NY)
909 Third Avenue
New York, NY 10022

DENISE COTE, District Judge:

        Capstone Asset Management Co., Ltd. ("Capstone") has sued

Dearborn Capital Group LLC ("Dearborn") and its principal Oren

Richland ("Richland") to recover out-of-pocket expenses that it
incurred during its attempt to assist the defendants in securing
financing.  The defendants have moved to dismiss all claims.
For the reasons that follow, the motion is granted.

## Background

The following facts are taken from the complaint and
documents properly considered on this motion to dismiss.  The
alleged facts are assumed to be true.

Dearborn, a real estate and investment company based in New
York, and its managing principal Richland, sought to purchase a
majority stake in a Chicago skyscraper known as the Citadel
Center.  In 2019, Dearborn signed a purchase agreement with the
majority owner of the Citadel Center but needed outside funding
to complete the acquisition.  Dearborn asked Capstone, a real
estate management firm based in South Korea, to assist in
obtaining the necessary funding.  Capstone asserts that it
agreed to assist Dearborn subject to a promise that Dearborn
would reimburse Capstone for its reasonable expenses.

Over the course of roughly a year, Capstone worked with two
potential sources of funding.  The first source of funding
identified by Capstone was IBK Securities Co. Ltd. ("IBK"), a
subsidiary of the government-owned Industrial Bank of Korea.  On
October 17, 2019, Dearborn, Capstone, and IBK signed a letter

setting out the terms of the proposed joint venture that would acquire the Citadel Center (the "October IBK Letter").  This letter would become the first of two documents signed with IBK (the "IBK Letters"), as well as the first of ultimately five documents executed by Dearborn with the participation of Capstone before the acquisition deal finally fell apart in September 2020.

In the October IBK Letter, Dearborn provided Capstone US Private Real Estate Fund XI, along with IBK, which is described as an affiliate of the Fund, with an outline of the terms upon which Dearborn, the Fund and its affiliates "will form a joint venture" to acquire the Citadel Center.  The Letter defines Dearborn as the "Sponsor" and the Fund and its affiliates, including IBK, as the "Preferred Member."

In several passages, the Letter explained that it was non-binding.  The opening paragraph concludes with the following sentence in underlined text: "This is not a commitment by either Party."  The next paragraph explains that the "letter shall serve as a general non-binding memorandum of understanding amongst the parties regarding the formation purpose and governance of the Company.  If agreeable, the Parties shall execute this letter and, thereafter, a full operating/joint venture agreement" shall be executed "concurrently with signing

of the purchase and sale agreement for the acquisition of" the
Citadel Center.  The final paragraph in Dearborn's ten-page
letter includes the following sentence: "We appreciate the
opportunity to present this letter and non-binding term sheet
for your consideration and we look forward to successfully
closing this transaction."  These passages shall be referred to
collectively as the Disclaimers.

The body of the Letter outlines the terms of the
contemplated transaction.  The Letter proposed an approval date
of November 15, 2019, and conditioned the final equity
commitment on exclusivity given to IBK "along with Capstone as
an asset manager."  There are two provisions in the October IBK
Letter that Capstone asserts are particularly relevant to its
claim for reimbursement.

A paragraph entitled "Due Diligence Reimbursement" states:
"Upon successful closing of the transaction, Sponsor shall
reimburse Preferred Member's due diligence and legal expenses up
to $250,000 (inclusive of the amount reimbursed with the
Deposit)."  (Emphasis added.)  A paragraph entitled "Costs"
states: "Subject to the limitations in the paragraph marked 'Due
Diligence Reimbursement'" the Sponsor "will be responsible for
paying all of Preferred Member's out-of-pocket costs associated
with this transaction whether incurred at closing or

4

thereafter." (Emphasis added.) After a lengthy list of types of expenses, such as fees paid to the Preferred Member's consultants engaged to underwrite the investment and customary loan fees, the paragraph concludes: "To the extent incurred, such fees and expenses shall be paid by Sponsor whether or not the preferred investment shall close or be funded."

On November 15, 2019, Capstone, IBK, and Dearborn executed a second letter, which expressly superseded the October IBK Letter (the "November IBK Letter"). The November IBK Letter described a joint venture between the same Sponsor and Preferred Member but modified some of the financial terms and other components of the joint venture. It also added a section describing the "Closing Requirements" of the Preferred Member and proposed an approval date of January 10, 2019.

The two Letters had identical Disclaimers and paragraphs addressed to Costs and Due Diligence Reimbursement, with one exception. A new sentence appeared at the end of the Due Diligence Reimbursement paragraph: "If this transaction fails to close due to Sponsor Member's responsibility including, but not limited to, failure to satisfy the Closing Requirements, then Sponsor shall reimburse all of Preferred Member's out of pocket expenses."

After IBK walked away from the transaction, Capstone contacted Hana Financial Investment Co., Ltd. ("Hana"), a private financial services company based in South Korea, to participate in a transaction with Dearborn.  Capstone and Dearborn then signed three successive Term Sheets (together, the "Term Sheets") for a mezzanine loan.  In each Term Sheet, Dearborn is defined as the Sponsor and the owner of the Borrower.  The Lender is defined as the Capstone Fund, a Korean Real Estate Fund ("KREF") established and managed by Capstone. Hana is not identified in the Term Sheets and is not a signatory to them.

The first Term Sheet, which is nine pages in length, is dated February 4, 2020 (the "February Term Sheet").  Its opening paragraphs explain: "This Term Sheet constitutes neither an offer nor a commitment by Lender . . . to make any Loan, but rather summarizes the general terms under which the Lender would be willing to consider funding the Loan.  The terms outlined below will be subject to, among other things, execution of final loan documents, satisfactory completion of due diligence . . . and receipt of all necessary internal approvals by Lender."[1] This disclaimer was repeated in each of the three Term Sheets.

---

[1] The first Term Sheet repeats similar disclaimer language for a second time in a paragraph labeled Material Adverse Change.  The other two Term Sheets are much shorter and do not include this repetition.

The February Term Sheet expired, "[e]xcept as expressly set forth herein," on February 29, 2020.

As reflected in the February Term Sheet, Dearborn paid KREF a Good Faith Deposit of $50,000.  The deposit was refundable if the transaction did not close due to KREF's "bad faith refusal to close."  "Otherwise, Lender shall retain the Good Faith Deposit as liquidated damages to Lender for its losses and damages related to the failure of the Loan to close."  The paragraph warns, however, that "[t]he acceptance of the Good Faith Deposit by Lender shall not constitute a commitment or an undertaking by Lender to make the Loan."

The description of the Good Faith Deposit appeared in a section entitled "Loan Expenses and Good Faith Deposit."  The section begins: "Notwithstanding anything to the contrary contained herein, Borrower shall pay all reasonable out-of-pocket costs and expenses of Lender of processing, underwriting, servicing, and closing the Loan . . . irrespective of whether the Loan closes."  The section concludes with the following: "The terms and provisions set forth in this 'Loan Expenses and Good Faith Deposit' section are intended to and do create binding and enforceable obligations in accordance with such terms and provisions that will survive any termination of this

Term Sheet."  This section was repeated in each of the subsequent Term Sheets.

In mid-April 2020, Richland became aware that the majority owner of the Citadel Center was exploring a refinancing instead of a sale of its stake in the building.  Richland did not inform Capstone of this change of plans and continued to encourage Capstone's belief that a mezzanine loan was still needed. Dearborn and Capstone subsequently signed the second Term Sheet on May 15, 2020 (the "May Term Sheet").  This four-page document was set to expire on June 30, 2020.  The May Term Sheet adjusted the amount of the proposed loan downward.

Ten days later, on May 25, 2020, Richland wrote to Capstone, stating that "we are on a very tight timeframe right now" and that it was "imperative that we receive the updated [documents] from Hana, otherwise we have to conclude down another path."  Capstone continued to work to secure financing documents from Hana.  On June 25, 2020, Richland wrote again, stating that he was "ex[c]ited to know that Hana is ready to proceed" and that Dearborn was working with the seller and the refinancing bank to "ascertain the most beneficial way to close this transaction."  Also in June, Hana transferred funds to an account controlled by Capstone in anticipation of a closing to occur the following month.

On August 18, 2020, Capstone and Dearborn executed their third Term Sheet (the "August Term Sheet"). It was just over three pages in length and expired on September 15, 2020.

In September 2020, Capstone concluded that the majority owner of the Citadel Center was uninterested in a sale requiring mezzanine financing and it approached Dearborn to recover its out-of-pocket due diligence expenses. Dearborn refused to pay unless the parties entered a "replacement deal," to which Capstone objected.

On February 4, 2021, Capstone filed this action to enforce the reimbursement provisions of what it alleges are five independently enforceable agreements: the two IBK Letters and three Term Sheets. It seeks reimbursement of approximately $650,000 in out-of-pocket expenses that it asserts it incurred as a result of pursuing financing for the failed acquisition of the Citadel Center. The defendants filed a motion to dismiss on April 5, 2021. The motion became fully submitted on May 14, 2021.[2]

## **Discussion**

Capstone brings claims against Dearborn for breach of contract, promissory estoppel, equitable estoppel, and unjust

---

[2] Capstone was given an opportunity to amend and declined to do so.

enrichment, and against Richland for intentional
misrepresentation.  The parties agree that New York law governs
this dispute.  See Alphonse Hotel Corporation v. Tran, 828 F.3d
146, 152 (2d Cir. 2016).[3]

When deciding a motion to dismiss for failure to state a
claim pursuant to Rule 12(b)(6), Fed. R. Civ. P., a court
"consider[s] the legal sufficiency of the complaint, taking its
factual allegations to be true and drawing all reasonable
inferences in the plaintiff's favor."  Brooklyn Ctr. for
Psychotherapy, Inc. v. Philadelphia Indem. Ins. Co., 955 F.3d
305, 310 (2d Cir. 2020) (citation omitted).  To survive a motion
to dismiss, "a complaint must contain sufficient factual matter,
accepted as true, to state a claim to relief that is plausible
on its face."  Honickman v. BLOM Bank SAL, 6 F.4th 487 (2d Cir.
2021) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)).  A
court is not "bound to accept as true a legal conclusion couched
as a factual allegation."  Iqbal, 556 U.S. at 678 (quoting Bell
Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)).

In determining the adequacy of a complaint, "a district
court may consider the facts alleged in the complaint, documents
attached to the complaint as exhibits, and documents

---

[3] The two IBK Letters contain a New York choice of law provision.
None of the three Term Sheets contains a choice of law
provision.

incorporated by reference in the complaint." DiFolco v. MSNBC
Cable L.L.C., 622 F.3d 104, 111 (2d Cir. 2010).  "Where a
document is not incorporated by reference, the court may
nevertheless consider it where the complaint relies heavily upon
its terms and effect, thereby rendering the document integral to
the complaint." Id. (citation omitted).  Reliance on the terms
and effect of a document "generally occurs when the material
considered is a contract or other legal document containing
obligations upon which the plaintiff's complaint stands or
falls." Nicosia v. Amazon.com, Inc., 834 F.3d 220, 230-31 (2d
Cir. 2016) (citation omitted).

I.   Breach of Contract

     Capstone alleges that Dearborn breached the explicit
obligation memorialized in each IBK Letter and the three Term
Sheets to reimburse Capstone's reasonable out-of-pocket
expenses.  The defendants contend that Capstone has failed to
adequately plead the existence of a binding contract or damages
to Capstone itself caused by Dearborn's failure to perform.

     "To state a claim for breach of contract under New York
law, the complaint must allege: (i) the formation of a contract
between the parties; (ii) performance by the plaintiff; (iii)
failure of defendant to perform; and (iv) damages." Nick's
Garage, Inc. v. Progressive Cas. Ins. Co., 875 F.3d 107, 114 (2d
Cir. 2017) (citation omitted).  The ultimate issue governing

whether a contract exists is "the intent of the parties: whether the parties intended to be bound, and if so, to what extent." Vacold LLC v. Cerami, 545 F.3d 114, 125 (2d Cir. 2008) (citation omitted).

Under New York law, "a fundamental objective of contract interpretation is to give effect to the expressed intention of the parties." In re MPM Silicones, 874 F.3d 787, 795 (2d Cir. 2017). "Where the parties' intention is clear from the four corners of the instrument, no ambiguity exists requiring a factual inquiry into intention, and interpretation is a matter of law." Pharm. Soc. of the State of N.Y., Inc. v. Cuomo, 856 F.2d 497, 501 (2d Cir. 1988). "The best evidence of what parties to a written agreement intend is what they say in their writing." Tomhannock, LLC v. Roustabout Res., LLC, 33 N.Y.3d 1080, 1082 (2019) (citation omitted). When multiple contracts are at issue, "all writings which form part of a single transaction and are designed to effectuate the same purpose [must] be read together, even [if] they were executed on different dates and were not all between the same parties." TVT Records v. Island Def Jam Music Group, 412 F.3d 82, 89 (2d Cir. 2005) (citation omitted).

"The initial inquiry is whether the contractual language, without reference to sources outside the text of the contract,

is ambiguous." In re MPM Silicones, 874 F.3d at 795.  A
contract is unambiguous if its "language has a definite and
precise meaning about which there is no reasonable basis for a
difference of opinion." Keiler v. Harlequin Enters. Ltd., 751
F.3d 64, 69 (2d Cir. 2014).

To determine whether disputed contract language is
ambiguous, a court must ask whether it is "ambiguous when read
in the context of the entire agreement." Law Debenture Trust
Co. of N.Y. v. Maverick Tube Corp., 595 F.3d 458, 467 (2d Cir.
2010) (citation omitted).  "Where consideration of the contract
as a whole will remove the ambiguity created by a particular
clause, there is no ambiguity." Id. (citation omitted).  And
"where a conclusory allegation in the complaint is contradicted
by a document attached to the complaint, the document controls
and the allegation is not accepted as true." Amidax Trading
Grp. v. S.W.I.F.T. SCRL, 671 F.3d 140, 147 (2d Cir. 2011).

Finally, "[i]f a contract is clear, courts must take care
not to alter or go beyond the express terms of the agreement, or
to impose obligations on the parties that are not mandated by
the unambiguous terms of the agreement itself." Torres v.
Walker, 356 F.3d 238, 245 (2d Cir. 2004) (citation omitted).  In
interpreting contracts, "words should be given the meanings
ordinarily ascribed to them and absurd results should be

avoided." <u>Mastrovincenzo v. City of New York</u>, 435 F.3d 78, 104 (2d Cir. 2006) (citation omitted).

The law recognizes that parties may exchange and even sign writings in the course of negotiating commercial transactions that are preliminary and non-binding. <u>Brown v. Cara</u>, 420 F.3d 148, 153 (2d. Cir 2005).  In <u>Teachers Insurance & Annuity Association v. Tribune Co.</u>, 670 F. Supp. 491 (S.D.N.Y. 1987), the Honorable Pierre Leval articulated the analytic framework used in New York to determine the extent to which preliminary agreements may be binding.  New York distinguishes between Type I and Type II preliminary agreements.  <u>Cara</u>, 420 F.3d at 153.  A Type I agreement is fully binding and "preliminary only in form -- only in the sense that the parties desire a more elaborate formalization of the agreement." <u>Adjustrite Sys., Inc. v. GAB Bus. Servs., Inc.</u>, 145 F.3d 543, 548 (2d Cir. 1998) (citation omitted).  By contrast, a Type II agreement only binds the parties to "a mutual commitment to negotiate together in good faith in an effort to reach final agreement" and "does not commit the parties to their ultimate contractual objective but rather to the obligation to negotiate the open issues in good faith." <u>Id</u>. (citation omitted).  At the same time, "New York follows the generally accepted rule that when parties negotiating a proposed contract express an intent not to be

bound until their negotiations have culminated in the execution of a formal contract, they cannot be held bound until that event has occurred."  Jim Bouton Corp. v. Wm. Wrigley Jr. Co., 902 F.2d 1074, 1081 (2d Cir. 1990).

Read in its entirety, each of the IBK Letters and Term Sheets is unambiguously a non-binding agreement.  Each document included one or more express disclaimers.  And as each document explains, the terms in the body of the document were a proposed framework for executing a transaction.  Each document expressly recognized that other documents were necessary to form a binding commitment, whether it be a joint venture arrangement or the issuance of a mezzanine loan.  The very fact that there were five different documents within the course of a year, reflecting two very different structures of financing, reflects the preliminary nature of the documents.

Capstone does not suggest that any of the five documents was a binding contract requiring any signatory to enter into a joint venture or to fund a mezzanine loan.  Its breach of contract claim asserts, however, that one provision in each of the contracts created a binding commitment.  Capstone contends that the provisions requiring Dearborn to pay out-of-pocket costs to either the Capstone US Private Real Estate Fund XI and

its affiliate or the Capstone Fund is enforceable even if the rest of the document is not.

The provision in each document regarding a reimbursement of expenses stands on no separate footing than any of the other provisions in the proposals.  Each document contained many draft terms over which the parties could negotiate and which may or may not have survived those negotiations and appeared in any final agreement.  Therefore, whether reading each document by itself or reading the complaint as a whole, which incorporates each of the five documents in its allegations, none of the five documents is an enforceable contract and none of the reimbursement clauses is an independently enforceable and binding contract.  Dearborn's motion to dismiss the breach of contract claim is granted.

Capstone makes several arguments in support of its contention that the cost reimbursement provisions are enforceable.  First, it refers to the well-established principle that a "contract should be construed so as to give full meaning and effect to all of its provisions."  Olin Corp. v. Am. Home Assur. Co., 704 F.3d 89, 99 (2d Cir. 2012) (citation omitted). That principle of law is of no assistance to Capstone.  As explained above, none of the five documents was a binding contract.  Moreover, when giving effect to all of the provisions

of any one of the documents, it is inescapable that each document begins with and emphasizes a disclaimer that warns that the document is non-binding.

Next, Capstone relies on the principle that there may be an enforceable contract where non-material terms are left for future negotiation, citing Sustainable PTE Ltd. v. Peak Venture Partners LLC, 56 N.Y.S.3d 44, 46 (1st Dep't 2017).  This principle is inapposite.  All of the material terms in these five documents have explicitly been left open for future negotiations.

Capstone additionally argues that the cost reimbursement provisions should be construed as enforceable because each document was signed and contained other provisions that are subject to enforcement, to wit, a confidentiality provision, a choice-of-law provision, a forum selection clause, and an attorney's fees provision.  First of all, only the two IBK Letters contained these other provisions.  The two IBK Letters were drafted to assist in the creation of a joint venture in which Capstone US Private Real Estate Fund XI and IBK, working as a Fund affiliate, would function as a joint venture partner. IBK withdrew and no joint venture was pursued thereafter.  Each IBK Letter emphasized in its first paragraphs that the document did not create a commitment by any party and the letter simply

outlined the basic terms upon which a joint venture to acquire the Citadel Center might be formed.  The existence of these other provisions did not create a binding contract to form a joint venture or a binding commitment to adopt any of the joint venture terms, including the reimbursement of any out-of-pocket costs "associated with this transaction" that might be incurred by the Fund and its affiliates.

Because the breach of contract claim must be dismissed for the reasons just explained, it is unnecessary to reach the merits of the defendants' further arguments in support of dismissal.  Those arguments include the fact that, while Capstone is the signatory, Capstone is not named in the body of any of the documents as the joint venture partner or the entity that would provide mezzanine financing.  To the extent that any costs were to be reimbursed on account of these documents, it is the costs incurred by those other entities in connection with the contemplated transactions and not Capstone's costs.  It is also unnecessary to address Dearborn's argument that the documents are unenforceable because their terms lacked mutuality of obligation on Capstone's part.  The outlined obligations of the parties to a potential joint venture or mezzanine financing transaction were only proposed terms subject to further

negotiation.  They were not binding commitments and are unenforceable for that reason.

II.  Promissory Estoppel

Capstone alleges that it incurred costs in reliance on Dearborn's promise to repay Capstone for its reasonable expenses incurred in providing Dearborn assistance to obtain financing. The defendants move to dismiss this claim for Capstone's failure to plead a clear promise, reasonable reliance, or an unconscionable injury.

In New York, a claim for promissory estoppel must state "1) a clear and unambiguous promise; 2) reasonable and foreseeable reliance on that promise; and 3) injury to the relying party as a result of the reliance." Kaye v. Grossman, 202 F.3d 611, 615 (2d Cir. 2000).  In assessing the reasonableness of a plaintiff's alleged reliance, courts consider "the entire context of the transaction, including factors such as its complexity and magnitude, the sophistication of the parties, and the content of any agreements between them." Crigger v. Fahnestock & Co., 443 F.3d 230, 235 (2d Cir. 2006) (citation omitted).

Capstone has not pleaded that the defendants made a clear and unambiguous promise to Capstone that would reasonably induce reliance.  While the complaint explains that Capstone agreed to assist Dearborn subject to Dearborn's promise to repay

19

Capstone's expenses, the complaint does not identify when that promise was made or by whom.  Without more specificity, this conclusory pleading fails to state a claim.  As formulated, it states neither a clear promise nor a basis for any reasonable reliance.

In opposing this motion, Capstone relies as well on the five documents, contending that each of them also contains an unambiguous promise to reimburse Capstone's expenses.  But, for reasons already explained, none of the documents contains a clear and unambiguous promise to pay the expenses, and none could provide a basis for Capstone to expect such a payment. Each letter was a preliminary document that contemplated that an entity associated with Capstone might be able to participate in and profit from a future transaction -- either a joint venture or a mezzanine loan -- that would be subject to final documentation.  Because no transaction was ever finalized, none of the documents supports the pleading of a claim of promissory estoppel.  Moreover, the documents discuss reimbursement of expenses incurred by the entities associated with Capstone and not Capstone.

III. Equitable Estoppel

Capstone asserts that the doctrine of equitable estoppel requires enforcement of Dearborn's promises to repay its costs because it detrimentally relied on Dearborn's false

representations that the deal would close.  Dearborn argues that
this claim must be dismissed because equitable estoppel is an
affirmative defense and not an independent cause of action.

The equitable estoppel doctrine

> is imposed by law in the interest of fairness to
> prevent the enforcement of rights which would work
> fraud or injustice upon the person against whom
> enforcement is sought and who, in justifiable reliance
> upon the opposing party's words or conduct, has been
> misled into acting upon the belief that such
> enforcement would not be sought.

Fundamental Portfolio Advisors, Inc. v. Tocqueville Asset Mgmt.,
L.P., 7 N.Y.3d 96, 106 (2006) (citation omitted).  The purpose
of equitable estoppel "is to prevent someone from enforcing
rights that would work injustice on the person against whom
enforcement is sought."  Shondel J. v. Mark D., 7 N.Y.3d 320,
326 (2006).  Equitable estoppel is an "extraordinary remedy,"
Pulver v. Dougherty, 871 N.Y.S.2d 495, 496 (3d Dep't 2009), that
should be "invoked sparingly and only under exceptional
circumstances."  Luka v. New York City Transit Auth., 474
N.Y.S.2d 32, 35 (1st Dep't 1984), aff'd, 63 N.Y.2d 667 (1984).

Since the defendants have not acted to assert any rights
against Capstone, Capstone's claim of equitable estoppel must be
dismissed.  The defendants are correct that equitable estoppel
does not constitute an independent cause of action under New
York law.

IV.  Unjust Enrichment

Capstone's fourth cause of action asserts a claim of unjust enrichment.  The defendants argue that Capstone has failed to allege any unjust enrichment by the defendants.

To plead a claim for unjust enrichment, a plaintiff must allege "that (1) the other party was enriched, (2) at that party's expense, and (3) that it is against equity and good conscience to permit [the other party] to retain what is sought to be recovered."  Mandarin Trading Ltd. v. Wildenstein, 16 N.Y.3d 173, 182 (2011) (citation omitted).  "The essence of such a claim is that one party has received money or a benefit at the expense of another."  Kaye, 202 F.3d at 616 (citation omitted).  "[U]njust enrichment is not a catchall cause of action to be used when others fail."  Corsello v. Verizon New York, Inc., 18 N.Y.3d 777, 790 (2012).  "An unjust enrichment claim is not available where it simply duplicates, or replaces, a conventional contract or tort claim."  Id.; see also Benham v. eCommission Sols., LLC, 989 N.Y.S.2d 20, 21-22 (1st Dep't 2014) (dismissing unjust enrichment claim "as duplicative").

The unjust enrichment claim must be dismissed as duplicative of the breach of contract claim.  In addition, the complaint fails to plead that the defendants received the money or benefit that Capstone seeks to recover through this claim. As alleged in the complaint and the documents integral to it, a

Capstone affiliate was to participate in the joint venture and in the mezzanine financing arrangement should the parties succeed in negotiating the final form of either transaction and effect a purchase from the majority owner of the Citadel Center. That Capstone incurred costs in its effort to promote either form of transaction is not, as a matter of law, an event that unjustly enriched Dearborn.

V.   Fraudulent Misrepresentation

Finally, Capstone asserts a claim of fraud solely against Richland, Dearborn's managing principal, for intentional misrepresentation in connection with the May 15, 2020 Term Sheet.  Capstone asserts that Richland failed to timely disclose, before the execution of the May Term Sheet, that the seller of the Citadel Center was actively exploring a refinancing option that would not involve any participation by Capstone.  Richland moves to dismiss for failure to plead fraud with the specificity required by Rule 9(b), and argues as well that the fraud claim must be dismissed as duplicative of the breach of contract claim.

"Under New York law, fraud requires proof of (1) a material misrepresentation or omission of a fact, (2) knowledge of that fact's falsity, (3) an intent to induce reliance, (4) justifiable reliance by the plaintiff, and (5) damages." Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Secs., LLC, 797

F.3d 160, 170 (2d Cir. 2015).  To prevail on a motion to
dismiss, the plaintiff must "assert facts that plausibly support
the inference of fraud."  Id. (citation omitted).  Rule 9(b) of
the Federal Rules of Civil Procedure requires the plaintiff's
complaint to plead the circumstances of the alleged fraudulent
conduct and the defendant's mental state with heightened
particularity.  Id. at 171.  Thus, the complaint must "(1)
detail the statements (or omissions) that the plaintiff contends
are fraudulent, (2) identify the speaker, (3) state where and
when the statements (or omissions) were made, and (4) explain
why the statements (or omissions) are fraudulent."  Id.
(citation omitted).  For the defendant's mental state, the
alleged facts must "give rise to a strong inference of
fraudulent intent."  Id. (citation omitted).  A strong inference
"may be established either (a) by alleging facts to show that
defendants had both motive and opportunity to commit fraud, or
(b) by alleging facts that constitute strong circumstantial
evidence of conscious misbehavior or recklessness."  Eternity
Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co. of N.Y., 375 F.3d
168, 187 (2d Cir. 2004) (citation omitted).  To distinguish
between concurrently asserted fraud and breach of contract
claims under New York law, a plaintiff must "either: (i)
demonstrate a legal duty separate from the duty to perform under

the contract; . . . or (ii) demonstrate a fraudulent misrepresentation collateral or extraneous to the contract; . . . or (iii) seek special damages that are caused by the misrepresentation and unrecoverable as contract damages." Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc., 98 F.3d 13, 20 (2d Cir. 1996) (citation omitted).

Capstone has failed to plead its fraud claim with particularity.  It fails to identify a statement made by Richland, much less to allege facts that would support a strong inference of fraudulent intent during the period before the execution of the May Term Sheet.  While the complaint asserts that Richland "falsely conveyed" to Capstone that the deal involving the mezzanine financing was still moving forward, this conclusory statement is insufficient.  It does not plead the specific statement or identify when it was made.  Nor does it plausibly plead justifiable reliance.  The transaction under discussion was complex and its structure had already changed significantly before May of 2020.  The concept of a joint venture was replaced by mezzanine financing and the amount of the financing under discussion was substantially reduced as well.  By May 2020, the COVID-19 pandemic was wrecking havoc on the world's economy.  Finally, each of the documents executed

before and during May explicitly recognized that the transactions under discussion might never occur.

Capstone pleads that Richland owed a duty to disclose that the seller was in "active pursuit of an alternative refinancing option" and that a transaction "may be proceeding without Capstone's involvement."  "[A] concealment of facts supports a cause of action for fraud only if the non-disclosing party has a duty to disclose."  Remington Rand Corp. v. Amsterdam-Rotterdam Bank, N.V., 68 F.3d 1478, 1483 (2d Cir. 1995).  Such a duty "ordinarily arises where the parties are in a fiduciary or other relationship signifying a heightened level of trust."  Id. "[W]hen parties deal at arms length in a commercial transaction, no relation of confidence or trust sufficient to find the existence of a fiduciary relationship will arise absent extraordinary circumstances."  In re Mid-Island Hosp., Inc., 276 F.3d 123, 130 (2d Cir. 2002) (citation omitted).  The complaint does not allege that anything other than an ordinary commercial relationship existed between Capstone and Richland.  See id.  It does not plead that Richland had any duty under the law to disclose his current understanding or assessment of the seller's plans.

## <u>Conclusion</u>

The defendants' April 5, 2021 motion to dismiss is granted.

The Clerk of Court shall close the case.


Dated:     New York, New York
           September 17, 2021


                              _____
                                   DENISE COTE
                           United States District Judge